1

2

3

4

5

6

7

8                    # UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11    LUIS M. VACA,                          Case No. 1:12-cv-01223-AWI-SAB (HC)

12              Petitioner,                   FINDINGS AND RECOMMENDATION
                                              REGARDING FIRST AMENDED PETITION
13        v.                                  FOR WRIT OF HABEAS CORPUS

14    M.D. BITER,                             (ECF No. 17)

15              Respondent.

16

17          Petitioner is proceeding pro se with a petition for writ of habeas corpus pursuant to 28

18    U.S.C. § 2254.

19                                          **I.**

20                                     **BACKGROUND**

21          Following a jury trial in the Kern County Superior Court, Petitioner was convicted of

22    conspiracy to commit murder and attempted murder of Brandi Nye who was shot in the head.

23    Petitioner was also convicted of one count of conspiracy to dissuade a witness from testifying.

24    Various sentencing enhancements were found true including the discharge of a firearm by a

25    principal that caused great bodily injury and the crimes having been committed in association

26    with a criminal street gang.

27          Petitioner filed a timely notice of appeal.  On April 20, 2011, the California Court of

28    Appeal, Fifth Appellate District, reversed counts three and four, but otherwise affirmed the

                                              1

1    judgment.  The California Supreme Court denied review.

2          Petitioner filed a petition for writ of habeas corpus petition in the California Supreme

3    Court, which was denied on December 19, 2012.

4          Petitioner filed the instant petition for writ of habeas corpus on July 26, 2012, and a first

5    amended petition on January 18, 2013.  Respondent filed an answer to the amended petition on

6    April 4, 2013.   Petitioner filed a traverse on May 1, 2013.

**II.**

**STATEMENT OF FACTS**[1]

In March 2007, Brandi Nyi moved to Bakersfield because her mother was dying.
Nye started using methamphetamine and hanging out with gang members.  She
knew Emil Alvary (a.k.a Tiny) and Alfredo Palacios (a.k.a. Sapo or Freddy).  She
was friends with and did drugs with Emmalinda Martinez (a.k.a. Cookie) and she
was seeing defendant Santiago (a.k.a. Night Owl).

Nye was staying at the home of Donald Azevedo for a few days.  On March 3,
2008, Alvary and Palacios came to Azevedo's home to see Nye.  She told the two
that Azevedo had marijuana.  The men wanted to see the marijuana and Azevedo
showed it to them.  After looking at the marijuana, one of the men returned only
half of the marijuana to them.  Azevedo called him a thief and told him he had a
weapon and would blow his brains out.

Nye, Palacios, and Alvary left.  They returned shortly thereafter; Nye said they
wanted to apologize.  One of the men then held a gun to Azevedo.  He was tied up
and his money was taken.  One of the men stabbed his dog.  Nye stood at the door
crying.

Nye, Palacios, and Alvary were arrested.  Nye was questioned and told the police
she did not know anything.  All three were detained in jail.  After Nye had been
jailed for a couple of weeks she was told she was going to be released for a month
and maybe then she would remember something.  Alvary and Palacios were not
released.

When Nye was released from jail she was picked up by Palacios's parents.  His
parents took Nye to their house where Palacios's niece, Crystal, then took her to
meet up with Santiago.  They all went to Santiago's house, Santiago questioned
her as to what she said in court.  Nye told him that she did not say anything.  Nye
was kept at Crystal's house for a week, was never left alone (she was always with
Crystal, Santiago, Vaca or Christian Vargas-Diaz), and believed that she could not
leave.  During that week, Nye went to court with Jessica Quinton (a.k.a. Chicken)

---

[1] The pertinent statement of facts is taken from the state appellate court's decision dated April 20, 2011, which is
presumed correct.  28 U.S.C. § 2254(e)(1).

to hear Palacios's case. [2]

On March 24, 2008, police received a report of a woman in a roadway.  They responded to the scene and found Nye.  Nye had been shot in the head.  Some of Nye's personal belongings were found less than a mile from her location in the roadway.

Bakersfield Police Detective William Darbee, who had been involved in the investigation of the home invasion robbery of Azevedo, also became involved in the investigation of the shooting of Nye.  He linked the two cases together and retrieved a phone call made from jail by Palacios to Santiago.  In the recorded phone conversation Santiago asked Palacios, "Do you want-the, the meat I was talking to you about, do you want me to get rid of him or what?"  Palacios said, "Yes dude."  Santiago said, "Of her."  Palacios replied yes and confirmed that Santiago should take care of both of them.  Palacios said there would be no case if things were taken care of.  Santiago told Palacios that she was more important to him and it should be done tomorrow.  Santiago said that he had her "put away there."  Santiago said that whatever happened, "he's going to get scared."  Palacios told Santiago he did not think "she" said anything.  Santiago responded that he didn't understand how she was out.  To this Palacios said, "Well to [sic], then fuck that, both of them."  Santiago told Palacios that she was more critical.  To this Palacios said that, in the end, he was going to be the one that was going to say something.  Santiago responded that he would be too scared and Palacios agreed "as long as he knows."  Santiago told Palacios he would send someone to tell him the same thing would happen to him if he didn't watch out.  The two discussed that their plan could backfire but Palacios concluded there was no other way out.  Santiago said, "I got… Boy is gonna do that for me tomorrow."  Based on this phone conversation Santiago and Vaca (a.k.a. Boy) were arrested and Emmalinda Martinez was brought to the police station for questioning.

Although Martinez was married, she was dating Christian Vargas-Diaz.  After initially denying any involvement in the shooting of Nye, Martinez said that it was her car that was used, Vargas-Diaz was the driver and she was in the front seat.  She said three people were in the back seat, Night Owl, Nye, and Boy; Nye was in the middle.  She said everyone in the back seat got out.  Martinez said she and Vargas-Diaz stayed at the car and argued, she head Nye screaming, and heard a shot.  She then identified those two people as Night Owl (Santiago) and Boy (Vaca).  When Santiago and Vaca got back in the car, one of them said Nye got what she deserved.  Vargas-Diaz drove away and dropped Santiago and Vaca off somewhere on Weedpatch.  Vargas-Diaz and Martinez drove home.

At trial Martinez testified she had never seen Santiago or Vaca before.  She said she fell asleep in the car the night Nye was shot and didn't wake up until the next day.  She testified that she was made to say things during her interview by police

---

[2] When Nye testified in the current case, she was granted immunity regarding the home invasion robbery.  The jury was instructed that they could consider the grant of immunity in judging her credibility.

that weren't true.  During further questioning Martinez said she kind of remembered being there but said she did not see the shooting.  She testified that neither Santiago nor Vaca were in the car that night.

When Santiago was questioned at the police station he told officers that he was in Lamont and fell asleep about 10:00 p.m.  He slept until the next morning.  During this time his cell phone was with him in the charger being charged.  When Vaca was questioned he said he was in Lamont on Easter (the day before the early morning shooting).  Vargas-Diaz was also questioned and denied all knowledge of the shooting.

Jessica Quinton testified that she met Nye the night Nye was released from jail. She met her at an AM/PM.  Nye was in a car with Crystal.  Quinton was in a car with Night Owl, Boy, and a nephew named Diego.  The car Quinton was in followed the car Nye was in to Crystal's house.  While Nye was at Crystal's house she was always with Santiago, Vaca or Crystal.  The evening after the morning that Nye was shot, Santiago picked up Quinton.  Santiago told Quinton, "we did it."  Quinton did not know of a plan to kill Nye, but she did know of a plan to not let her talk and Quinton thought that maybe Nye would be beaten.  Quinton testified that Santiago told her of the plan to not let Nye talk, and that Vaca, Crystal, and Vargas-Diaz were present when Santiago said this.  Santiago told Quinton that he tried to fire the gun two times but it jammed.  He handed the gun to Vaca who shot Nye in the head.  Nye had tried to run, but Santiago grabbed her by the ponytail and the gun went off.  Santiago also told Quinton that there were others in the car and the shooting took place at the mouth of the canyon.  When Quinton was first interviewed she said she did not know anything.  She was later taken to the police station by her mother and she gave her statement.

Cell phone records of Santiago, Vaca, Martinez, and Vargas-Diaz were examined by an investigator from the district attorney's office.  There were several calls made from Santiago's cell phone near the location of the shooting, at the time of the shooting, including calls from Santiago to Vargas-Diaz.  There were no phone calls made on Vaca's cell phone from 11:30 p.m. on March 23, to 6:45 a.m. on March 24.

During the nine o'clock hour on the evening of March 24, Santiago sent Vaca three text messages.  The first text read, "news said it was not link to the case no suspects she is in fair condition."  The second said, "29" (a local television station).  The third said, "look on the internet under local."

Prints were found on Martinez's car.  These included Nye's fingerprints on the exterior right passenger window, prints of Vargas-Diaz on the interior right front door window, and a palm print of Santiago's on the trunk of the car.  No prints were retrieved that matched Vaca.

The distance between the muzzle of the firearm and Nye when she was shot was "inches to a foot."  Nye also had a wound to her knuckle consistent with a bullet wound.

Antonio Lopez testified for the prosecution.  He was a former member of the Colonia Bakers criminal street gang.  While he was in prison he contacted the district attorney's office wanting to testify in exchange for his release from prison; the prosecutor agreed.  When Lopez testified at the trial, he was not in custody.

Lopez testified that the Colonia Bakers street gang is a southern gang.  He described their territory, the crimes they commit, and their hierarchy.  He explained that, when southern gang members are in prison, they all associate with the Surenos prison gang.  He testified that it is a big deal in a gang to take out a snitch.  He also testified that because Palacios used family (Santiago was Palacios's cousin and Vaca was Santiago's nephew) to shoot Nye, it was not a gang thing.

Police Officer Shane Shaff testified as an expert on gangs.  He said that the Surrenos are a prison gang.  When southern Hispanic gang members go to prison they can become Surenos in prison.  Gang members may have an allegiance to more than one gang; a prison gang and a street gang.  Respect is important in a gang and can be gained by committing crimes.  If someone commits a crime and is known to be violent, people normally will not testify against them.  Surenos and southern street gangs do commit crimes together.

Shaff reviewed information on Santiago, Palacios, Vargas-Diaz, and Vaca.  He explained the basis for his opinion that Santiago was a member of the Surenos when he is in custody, but he did not believe Santiago was a member of a street gang "at this time."  It was Shaff's opinion that Vargas-Diaz and Palacios were members of the Colonia Bakers street gang.  Shaff said the information on Vaca was sparse, but during four bookings Vaca claimed an affiliation with the South and, in two of those four, claimed the clique of Lamont.  It was Shaff's opinion that Vaca was a possible associate of the Lamont street gang.

Shaff detailed predicate offenses for the Colonia Bakers criminal street gang.  He opined that a hypothetical crime (that mirrored the facts of this case) would be a benefit to the Colonia Bakers street gang; it would result in the release of two gang members and would boost the reputation of this gang.  People would not want to testify against someone so violent, and taking out a snitch is very important in gang circles.  He said it did not matter that two of the people involved were not members of the particular gang, because it still furthers the gang.  It did not matter that participants were family members because gang members oftentimes go to somebody they trust to commit these crimes.

(Ex. A to Answer, People v. Santiago, et.al., Nos. BF122970C & BF122970D, 2011 WL 1490753, at *2-*5.)

///

///

5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**III.**

**DISCUSSION**

**A.     Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody
pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws
or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,
529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed
by the U.S. Constitution.  The challenged conviction arises out of the Kern County Superior
Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28 U.S.C. §
2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of
1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its
enactment.  Lindh v. Murphy, 521 U.S. 320, 327 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499
(9th Cir. 1997).  The instant petition was filed after the enactment of the AEDPA and is therefore
governed by its provisions.

**B.     Standard of Review**

Where a petitioner files his federal habeas petition after the effective date of the Anti-
Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that
the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  "Federal habeas relief may not be granted for claims subject to § 2254(d)
unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly
established in the holdings of [the Supreme] Court."  Harrington v. Richter, __ U.S. __, 131 S.Ct.
770, 785 (2011) (citing 28 U.S.C. § 2254(d)(1) and Williams v. Taylor, 539 U.S. 362, 412 (2000).
Habeas relief is also available if the state court's decision "involved an unreasonable application"

6

of clearly established federal law, or "was based on an unreasonable determination of the facts" in light of the record before the state court. Richter, 131 S.Ct. 785 (citing 28 U.S.C. § 2254(d)(1), (d)(2)). "[C]learly established ... as determined by" the Supreme Court "refers to the holdings, as opposed to the dicta, of th[at] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. at 412. Therefore, a "specific" legal rule may not be inferred from Supreme Court precedent, merely because such rule might be logical given that precedent. Rather, the Supreme Court case itself must have "squarely" established that specific legal rule. Richter, 131 S.Ct. at 786; Knowles v. Mirzayance, __ U.S. __, 129 S.Ct. 1411, 1419 (2009). Moreover, the Supreme Court itself must have applied the specific legal rule to the "context" in which the Petitioner's claim falls. Premo v. Moore, __ U.S. __, 131 S.Ct. 733, 737 (2011). Under § 2254(d)(1), review is limited to the record that was before the state court adjudicated the claim on the merits. Cullen v. Pinholster, __ U.S. __, 131 S.Ct. 1388, 1398 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 131 S.Ct. at 786.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law. See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991). However, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Richter, 131 S.Ct. at 784.

//

//

7

### C.    Review of Petition

#### 1.    Fourth Amendment Challenge

A federal district court cannot grant habeas corpus relief on the ground that evidence was obtained by an unconstitutional search and seizure if the state court has provided the petitioner with a "full and fair opportunity to litigate" the Fourth Amendment issue.  Stone v. Powell, 428 U.S. 465, 494, 96 S.Ct. 3037, 3052 (1976); Woolery v. Arvan, 8 F.3d 1325, 1326 (9th Cir. 1993). The only inquiry this Court can make is whether petitioner had a fair opportunity to litigate his claim, not whether petitioner did litigate nor even whether the court correctly decided the claim. Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996); see also Gordon v. Duran, 895 F.2d 610, 613 (9th Cir. 1990) (holding that because Cal. Penal Code § 1538.5 provides opportunity to challenge evidence, dismissal under Stone was necessary).

The policy behind the Stone Court's analysis is that the exclusionary rule is applied to stop future unconstitutional conduct of law enforcement.  Stone, 428 U.S. at 492.  However, excluding evidence that is not untrustworthy creates a windfall to the defendant at a substantial societal cost. Stone, 428 U.S. at 489-90; Woolery, 8 F.3d at 1327-28.  Thus, the Ninth Circuit has described the rationale for this rule by saying:

> The holding is grounded in the Court's conclusion that in cases where a petitioner's Fourth Amendment claim has been adequately litigated in state court, enforcing the exclusionary rule through writs of habeas corpus would not further the deterrent and educative purposes of the rule to an extent sufficient to counter the negative effect such a policy would have on the interests of judicial efficiency, comity and federalism.

Woolery, 8 F.3d at 1326; see also Stone, 428 U.S. at 493-494.

California provides defendants such an opportunity in the trial court through California Penal Code section 1538.5.  Petitioner in fact filed a suppression motion and the trial court held a hearing and considered the evidence but denied the motion.  (CT 400-410.)  Because the state court provided Petitioner with a "full and fair opportunity to litigate" his Fourth Amendment issue, the claim must be denied.  Stone, 428 U.S. at 494.

#### 2.    Bruton Challenge

Petitioner contends the trial court erred by allowing the admission of co-defendant

Santiago's out-of-court statements which placed Petitioner at the scene when Nye was shot. More specifically, Petitioner challenges the statement by Santiago to Quinton that he tried to fire the weapon twice and when it did not fire, Santiago handed the gun to Vaca who shot Nye. Petitioner contends the trial court erred by allowing Quinton to testify as to that statement.

In rejecting Petitioner's claim, the California Court of Appeal held, in pertinent part:

> Here, although the shooting of Nye was complete, the conspiracy to prevent or dissuade a witness from testifying was not complete. Nye was not dead, and thus could still testify. At the time of Santiago's statement Nye was not prevented from testifying because she was alive and it was not known if the shooting was sufficient to dissuade her from testifying. In addition, the conspiracy included the goal of preventing or dissuading Azevedo from testifying. At the time of Santiago's statement it was not known if the shooting of Nye had this affect. "'It is for the trier of fact—considering the unique circumstances and the nature and purpose of the conspiracy of each case—to determine precisely when the conspiracy has ended.'" (citation omitted.) Thus, the object of the conspiracy here was neither attained nor defeated at the time of Santiago's statement and the conspiracy was ongoing.

> Vaca also argues that the statement of Santiago did not further the conspiracy and thus fails to meet the requirement that the statement must be made in furtherance of the conspiracy. . . . Here, the object of the conspiracy was to keep witnesses quiet. By revealing details of the killing to another, including that more than one person was involved and that the two continued in their enterprise even after the gun did not fire the first two times, Santiago might create further fear in the minds of witnesses who were alive if they were to learn of these facts. While the statement of Santiago was a recounting of the shooting of Nye, if the recounting were to reach the persons sought to be silenced, it had the potential of further dissuading their testimony. This exact type of scenario was discussed during the phone conversation between Palacios and Santiago. In addition, Quinton knew Nye and hung around people that Nye knew, thus the chance that Nye would learn of this was strong. Under the totality of the circumstances the statement was in furtherance of the conspiracy.

(Ex. A to Answer, Opinion at *12-*14, footnote omitted.)

In Bruton v. United States, 391 U.S. 123 (1968), the Supreme Court held that a defendant's Sixth Amendment right of confrontation is violated if a facially incrimination confession of a nontestifying co-defendant is admitted at a joint trial. The Bruton rule was refined in Richardson v. Marsh, 481 U.S. 200 (1987), which held that the admission of a nontestifying codefendant's confession with a proper limiting instruction did not violate the

9

1    Confrontation Clause.  Id. at 206-207.

2          As an initial matter, Petitioner's claim does not concern a violation of the Confrontation

3    Clause because as determined by the appellate court Santiago's statement to Quinton

4    incriminating Petitioner was made in furtherance of a conspiracy and therefore was not

5    testimonial with the meaning of Crawford v. Washington, 541 U.S. 36, 56 (2004);[3] United States

6    v. Allen, 425 F.3d 1231, 1235 (9th Cir. 2005) (co-conspirator's statements are not testimonial and

7    do not fall within the Crawford exception).

8          The appellate court reasonably determined that the out-of-court statement was not

9    testimonial as it clearly was not made with the purpose that it could be later used in judicial

10   proceedings.  The statement was made during a private conversation between Santiago and

11   Quinton with no police officer present and there is no plausible basis for relief.  This evidence

12   reasonably provided a basis for the trial court's determination that the statements were admissible

13   under the coconspirator exception.  See Cal. Evid. Code § 1223; see also Fed. R. Evid. 801(d)(2).

14   Thus, there is no showing the admission of the statements was contrary to, or an unreasonable

15   application of, clearly established federal law.  See 28 U.S.C. § 2254(d)(1).

16          3.     Instructional Error

17          Petitioner contends the trial judge was required to sua sponte instruct the jurors that

18   corroboration is needed to convict based on an accomplice's statements.

19          A challenge to a jury instruction solely as an error under state law does not state a claim

20   cognizable in a federal habeas corpus action.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).

21   Habeas corpus relief is only available if the instructional error implicates the fundamental fairness

22   of a trial in violation of due process or infringes upon an enumerated federal constitutional right.

23   Waddington v. Sarausad, 555 U.S. 179, 190-191 (2009).  A petitioner's burden is especially

24   heavy when a claim is based on the omission of an instruction because no erroneous instruction

25   was given.  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  An omission, or an incomplete

26   instruction, is less likely to be prejudicial than a misstatement of the law.  Id.  The significance of

27   the omitted instruction is evaluated by a comparison with the instructions that were given.  Id. at

28   _____

[3] Petitioner conceded as much in his opening brief on direct appeal.  (LD 22, at 36.)

156; Murtishaw v. Woodford, 255 F.3d 926, 971 (9th Cir.2001).

As an initial matter, Petitioner's claim was presented to the state court as a violation of state law, which is not cognizable via section 2254. Estelle, 502 U.S. at 71-72. A claim that the trial judge applied or interpreted state law governing jury instructions fails to state constitutional violation. 28 U.S.C. §§ 2254(a), 2241(c)(3).

In any event, Petitioner's claim does not give rise to a federal constitutional violation. "The Fourteenth Amendment does not forbid a state court to construe and apply its law with respect to the evidence of an accomplice." Lisenba v. California, 314 U.S. 219, 227 (1941). Although California Penal Code section 1111 provides that a conviction cannot be sustained upon the testimony of an accomplice unless it is corroborated, there is no constitutional mandate requiring accomplice testimony to be corroborated. United States v. Augenblick, 393 U.S. 348, 352 (1969) ("When we look at the requirements of procedural due process, the use of accomplice testimony is not catalogued with constitutional restrictions."); Laboa v. Calderon, 224 F.3d 972, 979 (9th Cir. 2000) ("[a]s a state statutory rule, and to the extent that the uncorroborated testimony is not 'incredible or substantial on its face,' [Section 1111] is not required by the Constitution or federal law."). Accordingly, this claim is without merit and should be dismissed.

4.    Instruction on Lesser-Included Offense

Petitioner contends the trial judge was required to sua sponte instruct the jurors that it could convict Petitioner of conspiracy to commit assault as a lesser offense included to conspiracy to commit murder.

Respondent submits this claim is based solely on state law and any attempt to raise a federal claim is unexhausted as it was challenged under state law only on direct review. Respondent is correct. First, the United States Supreme Court has held that a challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). Second, a claim that an instruction was deficient in comparison to a state model or that a trial judge incorrectly interpreted or applied state law governing jury instructions does not entitle one to relief under § 2254, which requires a violation of the Constitution, laws, or treaties of the United States. 28

11

1  U.S.C. §§ 2254(a), 2241(c)(3).

2      This basic, limiting principle is applicable in the present case, because the basis of

3  Petitioner's challenge is to the state court's decision in upholding the trial court's failure to

4  instruct sua sponte on a lesser included offense.  Although the Supreme Court has held that the

5  failure to instruct on lesser included offenses can constitute constitutional error in capital cases,

6  Beck v. Alabama, 447 U.S. 625, 638-646 (1980), it has reserved decision on which such an

7  omission in non-capital cases constitutes constitutional error.  Id. at 638 n.17.  Accordingly, there

8  is no clearly established federal law within the meaning of § 2254(d) concerning a state court's

9  rejection of a claim that a defendant's constitutional rights were violated by the failure to instruct

10  on a lesser included offense.  Therefore, there is no basis for relief on this claim and it must be

11  denied.

12      5.      Insufficient Evidence to Support Count Three Conspiracy

13      Petitioner contends there was insufficient evidence to support a separate conspiracy (count

14  three).  Petitioner succeeded on this claim during direct appeal as the California Court of Appeal

15  agreed that there was not substantial evidence to support the separate conspiracy charge and

16  reversed the conviction and related enhancements, which bars retrial.  Because federal habeas

17  relief extends solely to claims that would remedy unlawful custody, Bailey v. Hill, 599 F.3d 976,

18  981 (9th Cir. 2010), and Petitioner is not currently in custody on this charge, there is no relief

19  available by this Court.

20      6.      Insufficient Evidence Claims

21      Petitioner contends there is insufficient evidence to provide that: (1) the attempted

22  homicide was committed with intent to promote, further, or assist criminal conduct of the gang

23  (resulting in a gang firearm enhancement); (2) the attempted murder was premeditated; and (3)

24  that he conspired to commit murder.

25      The California Court of Appeal denied the claim stating in pertinent part:

26      Lopez testified as a witness for the prosecution.  He was 31 years old at the time of
    trial and stated that he had been a member of the Colonia Bakers street gang, but
    he was now a dropout.  He said the Colonia Bakers was a gang in town with a lot
27    of members.  He said he was an O.G.-old original gangster, before he dropped out.
    To be an O.G. a gang member has to be old, has to do "dirt" for the gang, supply

28

12

for them, [and] care for them.  Lopez said dirt is "you go out there and you take care of business, like sell dope, steal cars, shoot people . . . [b]eat people's asses . . . rob people, do burglaries, and sometimes you murder, stuff like that."  Lopez stated that he loved cars, and had been to prison five times for stealing cars.  He finally decided that all the things "these guys do is dumb."  So he dropped out.  He has seen members from the Colonia Bakers "doing dirt, fighting and stealing and robbing."

Lopez described the territory of the Colonia Bakers.  He said that gang members are required to protect their territory ("putting in work") for the benefit of the gang.  If they don't put in their work, then they get dealt with accordingly.  There is a hierarcy in the gang.  He explained that although the gangs may not get along on the streets, once a person becomes incarcerated you leave your differences on the street and get along with everybody.

Lopez testified that a lot of members of the gangs make their money by committing crimes.  If a gang member robbed someone they would probably use the money to buy drugs and would "give homeys hook-ups" for drugs.  The respect in the gang for that member would increase, at least until he ran out of drugs.  He said that respect is very important in the gang and if you put in more work, you get more respect.  People are particularly afraid of shooters in a gang.  Lopez said that he attended meetings of the gang.  At the meetings they talk about crimes that are going to be committed, including stealing cars and selling dope.  Shootings were discussed at these meetings as well as confrontations with other gangs.

Lopez identified Palacios and Vargas-Diaz at trial.  He had a personal dispute with Palacios, and Vargas-Diaz was present during this dispute.  He had seen Palacios at Colonia meetings, he had not been Vargas-Diaz at any of the meetings.

Lopez explained that there are gangs in neighborhoods and a different system of gangs in prison.  In prison the Hispanics break off into Northerners and Southerners.  The Surenos is the southern street gang.  Colonia Bakers associate with Surenos in prison.  The southern street gangs do not fight with each other in jail or prison.

Someone who wants to be a member of the Colonia Bakers, but is not a member, is a "wannabe."  The gang uses them.  Surenos and street gangs, like the Colonia Bakers, associate on the street and commit crimes together on the street.
Lopez testified that if someone snitches (testifies against a gang member), it is "like a death penalty."  If a gang member thinks that someone is snitching it is a "bullet to the head."  A person is on top of their game in a gang if they take out a snitch.

On cross-examination Lopez testified that Palacios's conspiracy to have Nye shot was for himself.  When asked if Palacios was doing it for the Colonia Bakers street gang, Lopez responded, "Not that I know of."  Lopez did not think Santiago was a member of the Colonia Bakers gang and said he did not know Vaca.  Lopez had

13

not been in contact with members of the gang for about a year.

On further cross-examination Lopez was asked about the shooting of Nye. Counsel for Santiago asked, "So it wasn't anything that started off with the Colonia." Lopez responded, "Well, it was called by—yeah. You know, Sapo's [Palacios] the one. He's from Colonia. See what I'm saying?"

As previously set forth, Bakersfield Police Officer Shane Shaff testified as an expert in the area of criminal street gangs. He is familiar with the Colonia Bakers criminal street gang in Kern County and has conducted investigations regarding it. Shaff described the territory of the Colonia Bakers and their rivals. Similar to the testimony of Lopez, Shaff said that when southern Hispanic street gang members go into prison they can become members of the Surenos while in prison. Gang members can share allegiance to a street gang and a prison gang.

Shaff testified that respect is the more important thing to members of Hispanic street gangs. They will commit crimes to gain or keep respect. A gang keeps its power by instilling fear in the community. A common sign or symbol of the Surenos street gang is the number 13.

Shaff reviewed information regarding Santiago. He had reviewed eight offense reports involving Santiago beginning in 1992. At that time Santiago claimed a street gang out of Los Angeles and said he "backs" the Southside and Lamont. Subsequent reports said that Santiago had the street name of Night Owl, and had gang tattoos. Shaff reviewed 17 booking reports for Santiago. When booked he claimed an affiliation with the South in most instances, and he claimed subsets of the South on six booking reports, including Al Capone (from Los Angeles) and Lamont (from Bakersfield). Based on all of these reports Shaff believed Santiago was a member of the Surenos when he was in custody, but was not a member of a street gang at this time.

Shaff reviewed reports for Palacios and Vargas-Diaz and concluded that they were members of the Colonia Bakers criminal street gang. Vaca is not a member of a criminal street gang, but he claimed an affiliation with the South and with Lamont in four bookings. He was a possible associate of Lamont.

Shaff detailed three predicate crimes committed by members of the Colonia Bakers, including the home invasion robbery by Palacios and Alvary. Shaff was asked a hypothetical question mirroring the facts of this case. His opinion was that this conduct would benefit the Colonia Bakers because two members would be released from prison, and it would also boost the reputation of the gang because the crime was violent and involved shooting a snitch; it was very important to a gang if they could "get a snitch." The crime furthers the gang even if nonmembers of that specific gang commit the crime. The fact that the nonmembers were related to the members of the gang occurs because gang members offentimes go to somebody they trust to commit these crimes.

. . .

14

Here defendants conspired with a known member of the Colonia Bakers (Palacios) to kill Nye. The purpose of the killing was to gain the release of Palacios and Alvary, both known gang members of the Colonia Bakers. While neither Santiago nor Vaca were members of the Colonia Bakers when they committed the target offense of killing Nye, they were accompanied by Vargas-Diaz, a known member of the Colonia Bakers. It was testified to by Shaff and Lopez that killing a snitch is very important to gangs and significantly elevates the reputation of the gang. Even without the expert's testimony, it was reasonable to infer that the killing of Nye was for the purpose of obtaining the release of two known gang members; that release would clearly benefit the gang.

Defendants argue that Shaff did not provide sufficient testimony to support the primary activities element of the criminal street gang enhancement. Both defendants ignore the testimony of Lopez, which more than sufficed to show this element. "Evidence of past or present conduct by gang members involving the commission of one of more of the statutorily enumerated crimes is relevant in determining the group's primary activities. Both past and present offenses have some tendency in reason to show the group's primary activity." (People v. Sengpadychith (2001) 26 Cal.4th 316, 323.) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute. Also sufficient might be expert testimony." (Id. at p. 324.)

Lopez testified to the extensive criminal activities of the Colonia Bakers. His testimony was more than sufficient to establish the primary activities element of the gang enhancement.

Sufficient evidence supported the gang enhancements, and because the gang enhancements were supported by substantial evidence, the gang element of the firearm enhancement was also supported by substantial evidence. In turn, the gang registration requirement was properly imposed.

(Ex. A to Answer, Opinion at *19-*23.)

The law on insufficiency of the evidence claim is clearly established. The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a federal court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16. Further, under the AEDPA, federal courts must apply the standards of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). Thus, this Court must

15

determine whether the state decision under review reflected an objectively unreasonable application of the <u>Jackson</u> standards to the facts of this case.  <u>Id.</u> at 1275.

In this instance, Petitioner does nothing more than disagree with the jury's findings, as upheld by the state appellate court, that there was sufficient evidence presented at trial to find beyond a reasonable doubt that the attempted murder was committed with the intent to promote, further, or assist the criminal conduct of the gang, that the attempted murder was premeditated, and Petitioner conspired to commit the murder.  The state court reasonably applied the <u>Jackson</u> standard to the facts.  Petitioner's disagreement clearly does not support a finding for habeas corpus relief, and there is no basis for relief on this claim.

7.    <u>Joinder During Trial</u>

Petitioner contends the trial court erred by denying his motion to sever his trial from co-defendant Santiago.  Prior to trial, Petitioner filed a motion for separate trials which the trial court denied finding that the case involved the same victims, same crimes, and the common threat of an alleged conspiracy, and the lack of prejudice supported that the cases be tried together.

After trial, Petitioner filed a motion for a new trial contending the failure to grant a separate trial violated his due process rights because of his association with codefendant Santiago who was of disreputable character.  The trial court denied the motion for new trial.  The trial court found the jury took considerable time in reaching its verdicts, and the jury followed the court's instructions.  The court also found there was substantial evidence to support the gang enhancement, and there was no error in admitting the gang evidence.

The California Court of Appeal denied Petitioner's claim that the trial erred in denying his motion for new trial stating in pertinent part:

> [Petitioner] now claims the trial court erred in denying his motion for a new trial because the joint trial prevented the jury from making a reliable determination of his guilt.  He asserts a finding of error is supported by the <u>Bruton</u> error, the strength of the case against Santiago versus the scant evidence against [Petitioner], the significant amount of evidence admissible only against Santiago, the inflammatory gang allegations where the expert agreed [Petitioner] was not a member of a criminal street gang, the jury's alarming questions during deliberations, and the fact that the jury did not find true that [Petitioner] shot Nye. [Petitioner] asserts these circumstances established the joint trial resulted in a miscarriage of justice.

16

. . .

We reject [Petitioner's] argument.  First, as previously set forth, the trial court did not err in admitting the conversation between Santiago and Quinton after the shooting occurred, so there was no <u>Aranda/Bruton</u> error.

While there was more incriminating evidence against Santiago then there was against [Petitioner], the evidence was not so one-sided that the jury would convict [Petitioner] based solely on the evidence against Santiago.

While there was some evidence admissible against Santiago only, the jury was instructed on each occasion to apply the evidence only against Santiago.  In addition, the bulk of the evidence admitted only against Santiago was favorable to [Petitioner].  For example, conversation with Nye about killing Azevedo, and [Petitioner] was not mentioned during the jailhouse conversation among Palacios, Santiago, and Lopez.  This evidence admitted against Santiago was not detrimental to [Petitioner].

One of the main theories of the prosecution was that this was a gang crime, where a gang member (Palacios) wanted to eliminate a witness (Nye).  Such a crime would benefit Palacios and Alvary (another known gang member) personally, but would also increase respect for the gang since eliminating a snitch is highly regarded in the gang culture.  Thus, gang evidence was highly relevant to the question of motive.  The fact that [Petitioner] was not a gang member would not have resulted in the exclusion of gang evidence if he had been tried separately.

While the questions sent out by the jury during deliberations indicates confusion on the part of at least one juror,[4] it is apparent from the fact that the jury convicted Santiago in count four and acquitted [Petitioner] of the same count, that they comprehended the instructions given by the court after they asked their questions.

The fact that the jury did not find true the overt act that [Petitioner] shot Nye does not demonstrate prejudice to [Petitioner].  [Petitioner] questions if he "did not shoot Brandi Nye, then what was it that [Petitioner] did?"  The fact that the jury did not find this overt act true, does not indicate that [Petitioner] was not involved.  It indicates the jury could not determine who fired the shot.  There was conflicting evidence on this point, Santiago told Quinton that [Petitioner] shot Nye, Lopez told Detective Darbee that he was told by Palacios that Vargas-Diaz shot Nye, and Martinez was inconsistent or could not remember when Vargas-Diaz was in the car and not in the car at the scene of the shooting.  The evidence demonstrated that [Petitioner] was in Crystal's home during the vigil to keep track of Nye and he was at the scene of the shooting.  He was involved in the shooting early on, because

---

[4] . . . [T]he fact that the jury sends a question to the court does not mean the entire panel misunderstands something.  It is very possible that only one juror misunderstood and the question was asked so the court could clarify, to the juror or jurors who misunderstood, the proper way to proceed.

1

2

Santiago told Palacios that "Boy" was prepared to do it.  The fact that the jury found this overt act was not true demonstrates that they considered the evidence carefully and could not determine who the shooter was.

3

4

5

6

7

This is a classic case for a joint trial.  Defendants were charged with the same crimes arising from the same events.  (People v. Letner and Tobin (2010) 50 Cal.4th 99, 150-151.)  The quantity and quality of the evidence was not so dissimilar that the jury was likely to convict [Petitioner] based upon the strength of the evidence against Santiago.  [Petitioner] has failed to show the requisite prejudice.

8

(Ex. A to Answer, Opinion at *25-*26.)

9

10

11

12

To the extent Petitioner is contending the state court violated California law by denying his motion for a new trial, his claim is not cognizable in this action.  Estelle v. McGuire, 502 U.S. at 68 ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

13

14

15

16

17

18

In order to succeed on this claim, Petitioner must demonstrate that the state court's denial of his severance motion "resulted in prejudice great enough to render his trial fundamentally unfair," in violation of due process.  Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1997).  "The requisite level of prejudice is reached only if the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict."  Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004) (citing Sandoval v. Calderon, 241 F.3d 765, 772 (9th Cir. 2001)).

19

20

21

22

23

24

25

Here, Petitioner has not demonstrated that the denial of his motion to sever his trial was prejudicial.  There is no basis to find error by the denial to severe the trials because both men were charged with the same offenses arising from the same conduct.  While there may have been stronger evidence against co-defendant Santiago presented at trial, that fact on its own is insufficient to find the trials should be have severed.  When a trial involves two or more codefendants, "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials."  Zafiro v. United States, 506 U.S. 534, 540 (1993).  Rather, the Supreme Court has concluded:

26

27

28

[A] court should grant a severance … only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.  Such a risk might occur when evidence that the jury should not consider against a defendant and that

1   |   would not be admissible if a defendant were tried alone is admitted against a
2   |   codefendant.

3   Id. at 539.  In addition, as stated by the appellate court, a majority of the evidence was cross-
4   admissible and there was strong evidence against each defendant.

5          Furthermore, any risk of prejudice was dispelled by the trial court's instructions to the
6   jury.  See Zafiro, 506 U.S. at 540-541 (trial court may cure possible prejudice from misjoinder by
7   giving instructions directing jurors to give separate consideration to each defendant and each
8   charge).  Here, the trial court properly instructed the jury that it was the prosecution's burden to
9   prove beyond a reasonable doubt that each defendant was the person who committed the crimes
10  with which he was charged, and that evidence which was admitted specifically against one of the
11  defendants could not be considered against the other defendant.  (CALJIC Nos. 220, 304;CT
12  1151, 1165.)  The record supports the finding that the jury presumably followed the trial court's
13  instructions as it found codefendant Santiago guilty of conspiracy (count 4 of the Information)
14  and Petitioner not guilty of the same charge.[5]  Thus, it clearly understood the instructions to
15  evaluate the evidence separately as to each defendant.

16          8.      Ineffective Assistance of Counsel

17          By way of a state habeas corpus petition filed in the California Supreme Court, Petitioner
18  alleged his trial counsel rendered ineffective assistance for failing to represent him to the "fullest
19  extent" possible.  In support of his claim, Petitioner points to the fact that defense counsel passed
20  away from "brain cancer," and during argument to the jury, counsel acknowledged his memory
21  was not infallible and that he was "dropping stuff" that day.

22          In order to succeed on a claim that counsel rendered ineffective assistance due to a mental
23  or physical illness, a petitioner must point to specific errors or omissions which prejudiced his
24  defense.  See e.g., Dows v. Wood, 211 F.3d 480, 485 (9th Cir. 2000) (holding the fact that
25  defense counsel had Alzheimer's disease did not create a presumption of ineffectiveness and
26  petitioner was still required to show deficiency based on "actual performance."); Smith v. Ylst,

_____

[5] See Richardson v. Marsh, 481 U.S. 200, 206 (1987) (noting that "almost invariable assumption of the law that jurors follow their instructions").

826 F.2d 872, 876 (9th Cir. 1987) (counsel's mental illness and subsequent placement during trial did not constitute deficient performance because defendant could not show prejudice); Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978) (the claim that the trial attorney was "too old and sick" was insufficient because there was no allegation of specific prejudice resulting from counsel's alleged illness); Pilchak v. Camper, 741 F.Supp. 782, 792-793 (W.D. Mo. 1990) (claim that defense counsel was mentally impaired insufficient without a showing of actual prejudice).

In this instance, Petitioner presents only double-hearsay (at the very least) from his replacement attorney as to trial counsel's death and the purported cause of death, which is insufficient to demonstrate deficient performance and prejudice.  See Barrett v. United States, 965 F.2d 1184, 1195 (1st Cr. 1992) ("These affidavits present no foundational facts as to the affiants' personal knowledge"); Dalli v. United States, 491 F.2d 758, 760 (2d Cir. 1974) ("hearsay statements will not normally entitle the applicant to relief . . . since such hearsay would be inadmissible at the hearing itself.").  Furthermore, even if counsel died from cancer after the trial, there is no inference that such cancer existed at the time of trial, let alone that there was any effect from it during the trial years prior.  Accordingly, there is no merit to Petitioner's claim and it should be denied.

    9.    Innocence Claim

Petitioner alleges an independent claim of actual innocence based on new evidence that was not present before the jury, namely, codefendant Santiago's statement, at sentencing, that Petitioner had nothing to do with the shooting.  Although "actual innocence" can sometimes excuse a procedural default or untimely filing, it is not in itself a "claim" upon which habeas corpus relief may be granted.  See e.g., McQuiggin v. Perkins, __ S.Ct. __, No. 12-126, 2013 WL 2300806, at *3-4 (May 28, 2013).  "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceedings.  Herrera v. Collins, 506 U.S. 390, 401 (1993); see also House v. Bell, 547 U.S. 518, 555 (2006); District Attorney's Office for Third Judicial Dist. v. Osborne, 557 U.S. 52 (2009) ("Whether such a federal right [to be release upon proof of actual innocence] exists is an open question.  We have

struggled with it over the years, in some cases assuming, arguendo, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet."). The Supreme Court reiterated such finding stating:

> This Court has never held that the Constitution forbids the execution of a convicted defendant who has had a full and fair trial but is later able to convince a habeas court that he is "actually" innocent. Quite to the contrary, we have repeatedly left that question unresolved, while expressing considerable doubt that any claim based on alleged "actual innocence" is constitutionally cognizable. [Citations omitted]. A state court cannot possibly have contravened, or even unreasonably applied, "clearly established Federal law, as determined by the Supreme Court of the United States," by rejecting a type of claim that the Supreme Court has not once accepted valid.

In re Davis, __ U.S. __; 130 S.Ct. 1, 3 (2009) (emphasis in original).

In any event, even if there was a freestanding claim of actual innocence, Petitioner has not made a compelling showing in support of such claim. The mere claim that Santiago attempted to take the blame and exonerate Petitioner after he had already been convicted does not support the finding that Petitioner is actually innocent. There is no basis to conclude a rational trier of fact would have found that he was factually innocent of the offenses. Accordingly, even if such claim was cognizable in this forum, there is no merit to his claim.

## IV.

## RECOMMENDATION

Based on the foregoing,

IT IS HEREBY RECOMMENDED that:

1.      The instant petition for writ of habeas corpus be DENIED; and

2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed

1   within fourteen (14) days after service of the objections.  The Court will then review the

2   Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that

3   failure to file objections within the specified time may waive the right to appeal the District

4   Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

5

6   IT IS SO ORDERED.

7

8    Dated:   __**August 21, 2013**__                 _____

                                                 UNITED STATES MAGISTRATE JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28